## Richmond

## SMOOT & SONS, INC., v. JOHNSON.

### January 16, 1913.

1. APPEAL AND ERROR—*Demurrer to Evidence—Error in Compelling Joinder.*—If, on a writ of error awarded to a defendant, it appears that the trial court erred in compelling the plaintiff to join in a demurrer to the evidence by the defendant, the effect would not be a dismissal of the writ of error as improvidently awarded, but the judgment would have to be reversed, the previous verdict of the jury set aside, and the case remanded for a new trial.

2. DEMURRER TO EVIDENCE—*Compelling Joinder—Postponing Insertion of Evidence—Case at Bar.*—It is not prejudicial nor an abuse of discretion for the trial court to compel a plaintiff to join in the defendant's demurrer to the evidence before the statement of the evidence is written out and made a part of the demurrer, where the court, without dispensing with the statement of the evidence, merely postpones the time of filing to a later day of the term to enable the stenographer who had taken down the evidence to put it in type, after which argument was to be heard on the demurrer to the evidence. Such a course is only intended to economize time and facilitate the proceedings, and is not prejudicial to the rights of the demurree. In the case at bar this method of procedure is also to be considered in connection with and in the light of the written agreement of counsel, copied in the opinion of the court.

3. MASTER AND SERVANT—*Injury to Servant—Two Ways of Doing Work—Selection of Unsafe Method—Contributory Negligence.*— Where a servant has the choice of two ways of discharging his duty, both of which are well known to him, one safe and the other dangerous, he owes a positive duty to the master to select the safe method, and if he voluntarily chooses the dangerous way and in consequence thereof is injured, he is guilty of such contributory negligence as bars recovery against the master.

4. MASTER AND SERVANT—*Injury to Servant—Avoidable Accident— Negligence.*—Although it may be seen, after an accident to a ser-

vant has happened, how it might have been avoided, the fact
that it was avoidable does not prove that the master was in
fault in not anticipating and providing against it.

Error to a judgment of the Circuit Court of Rappahan-
nock county in an action of trespass on the case. Judg-
ment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*S. S. P. Patteson* and *James H. Price,* for the plaintiff
in error.

*Charles H. Keyser* and *James F. Strother,* for the de-
fendant in error.

WHITTLE, J., delivered the opinion of the court.

This writ of error is to the judgment of the circuit court
overruling a demurrer to the evidence and rendering judg-
ment for the plaintiff for $10,000, the damages condition-
ally assesesd by the jury in an action for personal injuries
brought by the defendant in error, Bertram Johnson,
against the plaintiff in error, C. C. Smoot & Sons Co., Inc.

We are met at the threshold of our inquiry with the con-
tention on behalf of the defendant in error that the case
should be dismissed on the ground that the writ of error
was improvidently awarded, in this, that the trial court
erred in compelling the plaintiff to join in the demurrer to
the evidence, because, it is said, it did not contain a state-
ment of the evidence. 4 Min. Inst. (1st ed.) 748, 750;
*C. & O. Ry Co.* v. *Sparrow,* 98 Va. 630, 37 S. E. 302; *New-
port News & O. P. Ry., &c. Co.* v. *Nicolopoolos,* 109 Va.
165, 63 S. E. 443.

If there were any merit in the objection to the action of the court in compelling a joinder in the demurrer to the evidence—which we think there was not—the effect would not be a dismissal of the writ of error as having been improvidently awarded, but, for the error assigned, the judgment would have to be reversed, the previous verdict of the jury set aside, and the case remanded for a new trial. But the objection is not well taken. At the conclusion of the evidence (which was taken down in shorthand by a court stenographer), the defendant demurred to the evidence and assigned the grounds of demurrer in writing, but the plaintiff refused to join therein because the demurrant did not file therewith a statement of the evidence. The court, however, not dispensing with the statement of the evidence, compelled the plaintiff to join in the demurrer, observing that the evidence could be written out and filed before argument on the demurrer to the evidence; and, accordingly, directed the jury to retire and assess the damages; to which ruling the plaintiff excepted.

This course was only intended to economize time and facilitate the proceedings. The evidence had been taken down in shorthand, and the time of filing was merely postponed to a later day of the term to enable the stenographer to put it in type, after which, argument was to be heard on the demurrer to the evidence. This ruling of the court was not an abuse of its discretion, and could not possibly have prejudiced the rights of the plaintiff. Moreover, this incident of the trial must be considered in connection with and in the light of the following agreement:

"Memo.—It is agreed by counsel that the demurrer to the evidence may be written up and filed before the judge of this court in vacation at Warrenton, Va., on September 30, 1911, to have the same effect as if it was now filed; counsel for the defendant agreeing that they will cause copy of the evidence, as soon as it is written up by the

stenographer, to be delivered to one of the counsel for the plaintiff, the grounds of demurrer having this day been filed, and the proceedings in vacation to be entered up the same as if they had been taken in term time. And it is agreed that either party may make any motion or take any proceeding at Warrenton when said demurrer to the evidence is heard that they might take in term time. It is further agreed that this shall be entered as an order of this court."

In any aspect of the matter, this preliminary objection is without merit.

Upon the merits, the material facts of the case may be thus summarized: The accident occurred about 8.30 o'clock on the morning of April 21, 1911. At that time the plaintiff, a lad fifteen years and four months old, had been in the employment of the defendant as a laborer in its tannery for four months. He had also been reared in the vicinity of the plant, and, in a general way, had long been familiar with the premises. His regular work was drying hair, but on the morning of the accident he received a message, through George Brown, from J. E. Lemon, the superintendent of the department of labor, to go to the scouring room to help Brown bleach leather. Brown, at the same time, was also charged with a message from Lemon to Leake, who was operating the Fitzhenry machine, to change the machine, that it was injuring the leather the way it was running. This machine was used in scouring leather. Luther Clayton was operating a similar machine, the Monk machine, and the two machines were located nearly opposite each other, with an intervening space or passageway four and one-half or five feet in width. This passway was one of two routes from the place at which the plaintiff was at work to the scouring room, but it was rendered less safe by reason of the fact that it was at times (as was the case on the morning of the acci-

dent) partially obstructed by a pile of leather in the center which lessened the width of the passway with respect to the open pulleys and belting which supplied power to the two machines. There was, however, another and perfectly safe route leading to the scouring room, seven or eight feet wide, to the left of the Monk machine.

When the plaintiff was told that he was to assist Brown in the scouring room he followed him, and when Brown stopped to deliver the message to Leake the plaintiff also stopped and stood between the two machines with his back towards the Fitzhenry scourer. The position of Leake at the scouring table was such that his back was towards the passway between the machines and to the plaintiff. Leake's attention was monopolized by his work in running the machine, and he was ignorant of the presence of the plaintiff. Brown knew that the plaintiff had followed him to the place where Leake was at work, but his back was also turned towards the space between the machines, and he did not know that the plaintiff had stopped, or where he was standing. About five minutes are required to scour a side of leather on both sides, and when finished the operator throws it around to the right, turning in that direction in the process, and thus places it on the pile in the middle space between the machines. When Leake undertook to sling the hide, upon which he was at work when Brown came up, from the machine to the pile in the manner described, the plaintiff was still standing in the passway with his back to Leake, and was struck with the leather and fell on the belt of the Monk machine. His right arm was caught by the pulley and mangled to such an extent that it had to be cut off above the elbow. The scouring room in which the plaintiff was assigned to duty was a safe place, and the work to be done—bleaching leather—was free from danger; and if he had gone to his place of work by the passway to the left of the Monk machine (a route

with which he was familiar) or, for that matter, had gone the other way, between the machines, without loitering, the accident would not have happened. Yet of his own volition, without suggestion or direction from anybody, he not only selected the less safe way, but, moreover, placed himself in a position of known danger and remained there, according to his own statement, two or three minutes, until he was struck by the side of leather and knocked over on the belting. On cross-examination he admits that on a former occasion Brown had told him the Fitzhenry machine was dangerous and warned him not to stay about there. In explanation of his stopping by the way, he says he was waiting until he got an opening to go to his own work—that is, until Leake had thrown the hide on which he was at work. Continuing, he says: "When he started to throw the hide out, I started to get out of the way, but I had my back turned and the hide struck me."

Of the route between the machines, he says there was room to pass that way, "but it was dangerous, because I would have to walk right up closer to the pulley that was on the Monk machine if I did, and I thought I would wait until he (Leake) threw his hide out." When asked why he did not go the other way where there was no danger he replied: "I was following Mr. Brown and went the way he went."

It thus appears from the plaintiff's own version of the matter that he possessed intelligent knowledge of the situation and conscious appreciation of the dangers incident to the route which he had voluntarily chosen. It may be that it was a natural thing for him to follow Mr. Brown, whose orders carried him that way, but it was his plain duty not only to himself but to his employer to have selected the safe way, and he cannot, either in law or morals, visit the consequences of his own negligence upon the plaintiff in error, who had discharged its legal duty

towards him in full measure, and in no way contributed to his misfortune. Indeed, the casualty was an accident pure and simple, for which Leake himself would not have been answerable in damages.

The rule is well settled that where a servant has choice of two ways of discharging his duty, one safe and the other dangerous, he owes a positive duty to the master to select the safe method. And if he voluntarily chooses the dangerous way and is injured he is guilty of contributory negligence, and the master is not liable. *Street* v. *Norfolk & Western Ry. Co.,* 101 Va. 751, 45 S. E. 284; *Newport News, &c. Co.* v. *Beaumeister,* 102 Va. 681, 47 S. E. 821.

The declaration charges the defendant with negligence in leaving the pulley of the Monk machine unguarded. But the defendant's past experience in the operation of its tannery showed that there was no reasonable ground to apprehend danger from that source of such an accident as happened in this case.

In *Persinger* v. *Alleghany Ore & I. Co.,* 102 Va. 354, 46 S. E. 325, it is said: "After the accident happened it could be readily seen how the accident could have been avoided by boxing the end of the shaft, and that was done." Then follows a quotation from the opinion of Judge Cooley, in *Sjogren* v. *Hall,* 53 Mich. 274, 278, 18 N. W. 812, which shows that the fact that the accident was avoidable does not prove that the master was in fault in not anticipating and providing against it.

Without prolonging the discussion or multiplying authority, it is sufficient to say that we are of opinion that the evidence fails to make out a case of actionable negligence against the plaintiff in error. The judgment of the circuit court must, therefore, be reversed, the demurrer to the evidence sustained, and judgment rendered for the plaintiff in error.

*Reversed.*